[610 NYS2d 200]

JOAN DAWSON et al., Appellants, v RICHARD L. HIGGINS, as
Commissioner of the New York State Division of Housing
and Community Renewal, et al., Respondents.

First Department, April 5, 1994

### APPEARANCES OF COUNSEL

*Sam Kazman* of counsel, Washington, D.C. *(Ronald D. Hariri* with him on the brief; *Hariri & Wotman, P. C.,* New York City, attorneys), for appellants.

*June Duffy* of counsel, New York City *(Ellen J. Fried* with her on the brief; *G. Oliver Koppell, Attorney-General,* attorney), for Richard L. Higgins, respondent.

*Anthony M. Dilloff* of counsel, New York City *(Stephen J. McGrath* with him on the brief; *Paul A. Crotty, Corporation Counsel* of the City of New York, attorney), for City of New York, respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

This is an appeal from the rejection of a challenge to the constitutionality of section 26-408 (b) (1) of the Administrative Code of the City of New York and section 2204.5 (a) of the New York City Rent and Eviction Regulations of the New York State Division of Housing and Community Renewal (9 NYCRR 2204.5 [a]), which, insofar as relevant, prohibit a landlord's recovery of a rent-controlled housing accommodation for his or her family's use where a member of the household lawfully occupying the accommodation has been a tenant in the building for 20 years or more, on the ground that the enforcement of said provisions subjects the landlord to a compelled tenancy constituting a physical and regulatory taking of property and a violation of due process and the prohibition against involuntary servitude.

The facts, while sparse, are undisputed. In November 1983, plaintiff Joan Dawson, aware that the building housed two rent-controlled tenants, purchased the premises in question, a five-story brownstone at 240 Lenox Avenue in Manhattan. Joan Dawson resides in the building, as do her two adult children, plaintiffs Paul and Tandra Dawson, who live on separate floors. Tandra's daughter and Joan Dawson's two foster children also reside in the building. The Lenox Avenue brownstone is Joan Dawson's only real property.

The two tenants, neither a party to this action, have lived

in the premises since 1970. The record is silent as to whether they are disabled or elderly, the precise duration of their tenancy, their expected or likely continued occupancy in the building, the amount of rent they pay or the effect eviction might have on them. Under New York law in effect at the time of purchase, these tenants could have been evicted, assuming that the other statutory prerequisites for such eviction could have been met, so that Joan Dawson and her family could occupy the units for themselves. *(See,* Administrative Code former § Y51-6.0 [b] [1], recodified in 1986 as § 26-408 [b] [1].)

Rent-controlled residential units in New York City are simultaneously governed by local and State law and regulations. On the State level, the Legislature, in 1962, enacted the Local Emergency Housing Rent Control Act (L 1962, ch 21, § 1; McKinney's Uncons Laws of NY §§ 8601-8617), authorizing New York City to enact and administer its own rent control program. Pursuant to this enabling legislation, the City Council enacted Local Laws, 1962, No. 20 of the City of New York, the New York City Rent and Rehabilitation Law (originally Administrative Code § Y41-1.0 *et seq.,* now § 26-401 *et seq.).* In 1983, the Legislature enacted the Omnibus Housing Act (L 1983, ch 403), which transferred the administration of all rent-controlled housing to the New York State Division of Housing and Community Renewal (DHCR). New York City's then-existing Rent and Eviction Regulations became DHCR's regulations (Omnibus Housing Act § 28), which are set forth in 9 NYCRR part 2200 *et seq.* (incorporated in McKinney's Uncons Laws of NY § 8581 *et seq.).*

The Rent and Rehabilitation Law and DHCR regulations permit a landlord to seek a tenant's eviction and the recovery of a rent-controlled housing accommodation in a number of circumstances, including, *inter alia,* a tenant's violation of a substantial obligation of the tenancy; a subtenant's occupancy of the accommodation after the lease expiration; where, subject to certain conditions, possession is sought for the purpose of demolishing or substantially altering the premises; and, where the landlord wants to withdraw the premises from the market on the ground that its continued operation would impose undue hardship, and the rent regulatory agency finds there is no reasonable possibility that the landlord could realize a net annual return of 8½% of the property's assessed value and there has not been any intentional or wilful management of the property to impair the ability to realize such a

return. (Administrative Code § 26-408; 9 NYCRR part 2204.) The Rent and Rehabilitation Law and DHCR regulations also authorize the eviction of tenants where the landlord seeks to recover possession of the housing accommodation for his or her personal use or the personal use of his or her family and the landlord can show a good-faith, immediate and compelling need. (Administrative Code § 26-408 [b] [1]; 9 NYCRR 2204.5 [a].)

Seven months after Joan Dawson bought the brownstone, on June 19, 1984, the owner-occupancy eviction provisions of the rent control laws (Administrative Code former § Y51-6.0 [b] [1]) were amended. (L 1984, ch 234, § 1.) Under the amendment, effective immediately, tenants 62 years of age or older, or disabled, or who had resided in the building for 20 years or more could no longer be evicted for reasons of owner occupancy. The amendment applied to "any tenant in possession at or after the time it takes effect." (L 1984, ch 234, § 4.) Since the two tenants in the Lenox Avenue brownstone came under the amendment's 20-year tenancy provision, they were no longer subject to eviction on owner-occupancy grounds.

On August 29, 1990 Joan Dawson and her two children commenced this action against both the City and DHCR, challenging the 20-year residency bar to eviction as a physical as well as regulatory taking and a due process violation under both the Federal and State Constitutions and as constituting involuntary servitude under the Federal Constitution. After both defendants answered, each asserting the failure to state a cause of action, plaintiffs moved for summary judgment seeking a declaration of unconstitutionality. Both defendants separately cross-moved for summary judgment declaring the challenged statute and regulations constitutional.

In a well-reasoned and comprehensive decision essentially distinguishing the major cases invalidating housing regulations on takings grounds, such as *Seawall Assocs. v City of New York* (74 NY2d 92, *cert denied* 493 US 976) and *Loretto v Teleprompter Manhattan CATV Corp.* (458 US 419), on the ground that these cases did not involve, as here, preexisting relationships voluntarily assumed by the property owner, the IAS Court rejected all of plaintiffs' claims and declared the challenged provisions to be constitutional. Plaintiffs filed a direct appeal to the Court of Appeals pursuant to CPLR 5601 (b) (2) on the ground that the only issue presented involved the constitutionality of State legislation. The Court of Appeals

transferred the appeal to this Court. ([80 NY2d 969] *See,* NY Const, art VI, § 3 [b] [2]; § 5 [b]; CPLR 5601 [b] [2].) We affirm.

Two provisions of the United States Constitution, the 14th Amendment's Due Process Clause and the 5th Amendment's Takings Clause,* protect property interests against governmental interference. In addition, under the New York State Constitution, no person may be deprived of his or her property without due process of law (art I, § 6) and private property may not be taken for public use without just compensation (art I, § 7 [a]). Despite these constitutional protections, property rights are not, however, absolute. They have long been subject to restrictions, for which there is no compensation, through the State's exercise of its police power in prescribing regulations "to promote the health, peace, morals, education, and good order of the people." *(Barbier v Connolly,* 113 US 27, 31.) "Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. * * * These restrictions are 'properly treated as part of the burden of common citizenship'." *(Keystone Bituminous Coal Assn. v DeBenedictis,* 480 US 470, 491, quoting *Kimball Laundry Co. v United States,* 338 US 1, 5.)

In the context of a landlord-tenant relationship the Supreme Court has noted that the States have " 'broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.' " *(Pennell v San Jose,* 485 US 1, 12, n 6, quoting *Loretto v Teleprompter Manhattan CATV Corp.,* 458 US, *supra,* at 440.) Similarly, in *Seawall Assocs. v City of New York* (74 NY2d, *supra,* at 112, n 11), the Court of Appeals noted that "government has considerable latitude in regulating landlord-tenant relationships to preclude eviction in hardship, emergency and rent-control cases." Over the years, the government, at the Federal, State and local level, has, in response to housing shortages, enacted legislation declaring the existence of a serious public emergency and restricting a landlord's right to raise rents and evict tenants. The courts have consistently upheld these restrictions and rejected claims of a taking without just compensation. *(See, e.g., Bowles v Willingham,*

---

* The taking without just compensation clause of the 5th Amendment is applicable to the States through the 14th Amendment. *(See, Chicago, Burlington & Quincy R. R. Co. v Chicago,* 166 US 226, 236.)

321 US 503 [upheld Federal legislation fixing maximum rents in "defense-rental" areas]; *Spring Realty Co. v New York City Loft Bd.,* 69 NY2d 657, *appeal dismissed* 482 US 911 [legislation protecting loft residents held not to constitute a taking]; *Benson Realty Corp. v Beame,* 50 NY2d 994, 996, *appeal dismissed sub nom. Benson Realty Corp. v Koch,* 449 US 1119 [rejected claim that continuation of New York City Rent Control Law effects an unconstitutional taking]; *see also, Bucho Holding Co. v Temporary State Hous. Rent Commn.,* 11 NY2d 469; *I.L.F.Y. Co. v Temporary State Hous. Rent Commn.,* 10 NY2d 263, 268, *appeal dismissed* 369 US 795; *Teeval Co. v Stern,* 301 NY 346, 362, *cert denied* 340 US 876; *Loab Estates v Druhe,* 300 NY 176, 180; *People ex rel. Durham Realty Corp. v La Fetra,* 230 NY 429.)

A physical taking occurs where governmental action results in the permanent physical occupation, either by the government itself or a private, government-authorized party, "to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *(Loretto v Teleprompter Manhattan CATV Corp.,* 458 US, *supra,* at 434-435.) In *Nollan v California Coastal Commn.* (483 US 825, 832), the Supreme Court held that the government's grant of "a permanent and continuous right" to pass across private property constituted a physical occupation.

In *Sobel v Higgins* (188 AD2d 286, *appeal dismissed* 81 NY2d 953, *lv denied* 82 NY2d 655), this Court rejected a taking argument identical to the one being made here. There, a landlord sought to withdraw housing accommodations from the rental market but was precluded by rent control provisions, the same as those being challenged in the instant matter, giving rent-controlled tenants the right to remain in possession by reason of age or duration of occupancy. This Court rejected the claim of a physical taking, finding that there was "hardly" a permanent physical occupation by a stranger or third party since the tenants were, as here, already residing in the premises at the time the landlord purchased the property. *(Supra,* at 287; *see also, Matter of Sourian v Higgins,* 170 AD2d 258; *Matter of McMurray v New York State Div. of Hous. & Community Renewal,* 135 AD2d 235, *affd* 72 NY2d 1022; *Matter of Lopez v Mirabel,* 127 AD2d 771; *Matter of Lavalle v Scruggs-Leftwich,* 133 AD2d 313.)

Despite this seemingly dispositive body of case law, plaintiffs argue that the Supreme Court's decision in *Yee v Escondido*

(503 US —, 112 S Ct 1522) and the Court of Appeals decision in *Seawall Assocs. v City of New York* (74 NY2d 92, *supra)* mandate a different result. *Yee* involved the interplay between a local rent control ordinance and California's Mobilehome Residency Law, which limited the bases on which the owners of mobile home parks may terminate the tenancy of mobile home owners who rent the "pads" on which the homes are placed and generally prohibited the park owner from requiring the removal of a home when it is sold. Petitioners, park owners, contended that the rent control ordinance, when viewed against the backdrop of the Mobilehome Residency Law, resulted in a physical taking of their property. The Court rejected this claim on the ground that in accordance with the Mobilehome Residency Law "a park owner who wishes to change the use of his land may evict his tenants." (503 US, *supra,* at —, 112 S Ct, *supra,* at 1528.) The *Yee* Court did note, however, and it is on this caveat that plaintiffs premise their argument, that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy" (503 US, *supra,* at —, 112 S Ct, *supra,* at 1529). The rent control provisions at issue, however, plainly do not require a landlord to remain in the rental market in perpetuity.

Notwithstanding the fact that 20-year tenants cannot be evicted for the personal use of the landlord or his or her family, the occurrence of a number of events would allow the landlord to recover such a tenant's housing accommodation. For instance, the landlord might recover the unit upon the tenant's death or upon the tenant's violation of a substantial obligation of the tenancy, or in instances where the tenant is committing acts constituting a nuisance or permitting the same or permitting the accommodation to be used for immoral or illegal purposes, or upon the landlord's decision to demolish or substantially alter the premises or to withdraw the premises from the rental market where there is no reasonable possibility of realizing a net annual return of 8½% of the property's assessed value. *(See,* Administrative Code § 26-408; 9 NYCRR part 2204.) Plaintiffs have failed to make a showing that these contingencies cannot occur and thus are unable to show that the amended owner-occupancy provisions have created perpetual tenancies. As the Court of Appeals has noted, "That a rent-regulated tenancy might itself be of indefinite duration—as has long been the case under rent control and

rent stabilization—does not, without more, render it a permanent physical occupation of property [citation omitted]." *(Rent Stabilization Assn. v Higgins,* 83 NY2d 156, 172.)

In *Seawall Assocs. v City of New York* (74 NY2d 92, *supra),* the Court of Appeals held that a local law which required owners who purchased investment properties to rehabilitate and rent vacant units for single-room occupancy—a use neither planned nor desired—constituted a physical taking and violated both the State and Federal Constitutions. In so holding, however, the Court went out of its way to distinguish the local law at issue and those that affected tenant-occupied property, noting: "The rent-control and other landlord-tenant regulations that have been upheld by the Supreme Court and this court merely involved restrictions imposed on existing tenancies where the landlords had voluntarily put their properties to use for residential housing. Unlike Local Law No. 9, however, those regulations did not force the owners, in the first instance, to subject their properties to a use which they neither planned nor desired. * * * By sharp contrast * * * Local Law 9 * * * requires owners to rehabilitate and offer their properties for rent, as SRO units, to persons with whom they have no existing landlord-tenant relationship." *(Supra,* at 105-106.) Thus, the Court of Appeals has drawn a sharp distinction with respect to the Takings Clause between regulation that protects the current tenant, which is generally permissible, and regulation that subjects the property to a use never intended, i.e., a landlord-tenant relationship, such as to constitute a physical taking. The challenged provisions fall into the former category.

■ Plaintiffs also claim a regulatory taking. Concededly, certain governmental action affecting private property may constitute a taking even if it does not result in the physical occupation of the property. *(Yee v Escondido,* 503 US, *supra,* at —, 112 S Ct, *supra,* at 1526.) Courts, however, have never found such a taking merely because a regulation deprives an owner of the most profitable or beneficial use of his property. To constitute a regulatory taking the challenged actions must be such that they fail substantially to advance a legitimate State interest or deprive the owner of the economically viable use of his property. *(See, Seawall Assocs. v City of New York,* 74 NY2d, *supra,* at 107; *Nollan v California Coastal Commn.,* 483 US, *supra,* at 834; *Keystone Bituminous Coal Assn. v DeBenedictis,* 480 US, *supra,* at 485.) The property owner who challenges government action as a regulatory taking "bears

the heavy burden of overcoming the presumption of constitutionality that attaches to the regulation and of proving every element of his claim beyond a reasonable doubt." *(De St. Aubin v Flacke,* 68 NY2d 66, 76.)* Plaintiffs have failed to meet this burden.

Plaintiffs' claim of a regulatory taking rests in part on the premise that the challenged regulations frustrate their reasonable investment-backed expectation of being able to evict their tenants. In making this argument, they rely on dicta in *Seawall* that "[t]he Supreme Court seems also to have adopted the view that a regulation which has the effect of substantially frustrating 'reasonable investment backed expectations' * * * constitutes a per se taking [citations omitted]." (74 NY2d, *supra,* at 107, n 6.) In fact, in *Lucas v South Carolina Coastal Council* (505 US —, —, 112 S Ct 2886, 2893), the Supreme Court identified at least two categories of regulations that, without any inquiry into the public interest advanced in support of the restraint, would give rise to a taking per se— those effecting a "physical 'invasion' " of the owner's property and those denying the landowner "all economically beneficial or productive use of land." While " '[t]he economic impact of the regulation on the claimant and * * * the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally" (505 US, *supra,* at —, n 8, 112 S Ct, *supra,* at 2895, n 8, quoting *Penn Cent. Transp. Co. v New York City,* 438 US 104, 124), neither constitutes a separate category of a per se regulatory taking. *(See, supra.)* The public purpose and character of the government's action is another noncategorical consideration in regulatory takings analysis. *(Birnbaum v State of New York,* 73 NY2d 638, 645, *cert denied* 494 US 1078; *see also, Rochester Gas & Elec. Corp. v Public Serv. Commn.,* 71 NY2d 313, 324.)

In assessing these noncategorical factors, courts must engage in "essentially ad hoc, factual inquiries" in order to "determin[e] when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *(Penn Cent. Transp. Co. v New York City,* 438 US, *supra,* at 124, citing *Goldblatt v Hempstead,* 369 US 590, 594.) "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every * * * change in the general law." *(Pennsylvania Coal Co. v Mahon,* 260 US 393, 413.)

Weighing these considerations, we are unable to find a regulatory taking. Any reasonable expectation plaintiffs had of evicting the two tenants in question must have been, realistically, a qualified one. As the IAS Court aptly noted, plaintiffs purchased a premises knowing that it was subject to rent control, a system under which landlord-tenant relationships are highly regulated and the continuing trend has been toward tenant protection. No one could reasonably expect that the regulatory scheme then in effect would remain fixed in all its permutations. For that reason, when an already extensively regulated sector of commercial life is subjected to further regulation of a similar kind, courts are reluctant to find that an investment-backed expectation has been frustrated. *(See, Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d, supra, at 324-325.)*

It should also be noted that any expectancy plaintiffs might have as to the recapture of the apartments for their own personal use was always contingent on their ability to demonstrate an immediate and compelling necessity for such use. *(See, Administrative Code § 26-408 [b] [1]; 9 NYCRR 2204.5 [a].)* Plaintiffs have failed to demonstrate that they would be able to make such a showing. Thus, any expectancy they might realistically have had was a speculative one.

Nor have plaintiffs given any hint as to the economic impact of the regulations on their property. Without some factual showing as to the rental income and purchase price of the building, no court can even begin to make an assessment of the regulations' economic effect. Since it is plaintiffs' burden to show the regulations' unconstitutionality beyond a reasonable doubt *(Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d, supra, at 319-320)*, the failure to tender the requisite financial data renders their claim infirm.

Finally, the nature of the regulation is not of the type to constitute a regulatory taking. In assessing the character of the governmental action in the face of a taking claim, the essential inquiry is whether the action has "permanently appropriate[d]" the owner's assets. *(Connolly v Pension Benefit Guar. Corp., 475 US 211, 225.)* The regulations at issue, as noted, do not create a perpetual tenancy but allow for termination of the tenancies affected by the occurrence of normal events.

■ Plaintiffs also argue that the challenged regulations effect a regulatory taking because they fail to serve a substan-

tial governmental purpose. A regulation can effect a taking if it fails substantially to advance a legitimate State interest. *(Keystone Bituminous Coal Assn. v DeBenedictis,* 480 US, *supra,* at 485, citing *Penn Cent. Transp. Co. v New York City,* 438 US, *supra,* at 124; *Seawall Assocs. v City of New York,* 74 NY2d, *supra,* at 107.) "[A] broad range of governmental purposes and regulations" will satisfy this legitimate State interest requirement. *(Nollan v California Coastal Commn.,* 483 US, *supra,* at 834-385.) As this Court noted in *Matter of McMurray v New York State Div. of Hous. & Community Renewal* (135 AD2d 235, 238, *supra),* "The protection afforded * * * long-term tenants of rent-controlled apartments is a tacit recognition of the devastating impact that evictions can have on such tenants and their communities. * * * [L]ong-term tenants, 'by virtue of their longevity, have become an integral part of their community and have not violated their obligations to the landlord * * * [and] should [therefore] be afforded protection from eviction since forcing them out of their housing accommodations after 20 years could have a devastating effect on them and their community' ". The argument that a tenant of 20 years would face no greater hardship from eviction than any other tenant ignores reality. After a long residency a tenant takes root in the community and his or her forced removal from familiar surroundings causes, at the very least, severe disruption. It can also contribute to the problem of homelessness. Clearly, the residency status protected by the challenged regulation advances a legitimate State interest.

█ The argument that the challenged rent control provision subjects plaintiffs to involuntary servitude is frivolous. *(See, Sobel v Higgins,* 188 AD2d, *supra,* at 287.) Contrary to plaintiffs' claim, the amendment to the owner-occupancy rent control provision protecting 20-year tenants from eviction does not compel them to remain a landlord against their will. As noted already, plaintiffs purchased this property knowing that it was occupied by rent-controlled tenants and that its use was regulated. *(See, Marcus Brown Co. v Feldman,* 256 US 170, 199.) Plaintiffs need only sell their building to escape the minimal restrictions placed on them by the challenged provisions. Plaintiffs' due process claims are equally frivolous. Rent control provisions such as those at issue are well within the government's police powers. They bear "a reasonable relationship to the valid public purpose of preserving affordable housing and preventing the dislocation of lower income and

moderate income tenants [citations omitted]." *(Sobel v Higgins,* 188 AD2d, *supra,* at 288.)

Accordingly, the judgment of the Supreme Court, New York County (Phyllis Gangel-Jacob, J.), entered July 10, 1992, which, *inter alia,* declared Administrative Code § 26-408 (b) (1) and 9 NYCRR 2204.5 (a) to be constitutional, should be affirmed, without costs or disbursements.

ELLERIN, ASCH and TOM, JJ., concur.

Judgment, Supreme Court, New York County, entered July 10, 1992, unanimously affirmed, without costs.